**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

|  |  |  |
|---|---|---|
| **THE FREEDOM FROM RELIGION FOUNDATION, <u>et al.</u>,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 07-356 (SM)** |
| **THE CONGRESS OF THE UNITED STATES OF AMERICA, <u>et al.</u>,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF THE**
**<u>FEDERAL DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      PLAINTIFFS LACK STANDING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      All Plaintiffs Lack Standing to Challenge the Federal Pledge Statute on Its
                Face. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        B.      All Plaintiffs Lack Standing to Sue the Dresden School District and School
                Administrative Unit 70. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      FFRF Lacks Standing to Raise Any Claim in This Case. . . . . . . . . . . . . . . . . . 7

II.     THE FEDERAL DEFENDANTS ARE IMMUNE FROM PLAINTIFFS' CLAIMS. . . . 8

        A.      Plaintiffs' Claims Against Congress Are Barred by the Speech or Debate
                Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Plaintiffs' Constitutional Claims Against the Federal Defendants Are Barred
                by Sovereign Immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    4 U.S.C. § 4 IS CONSTITUTIONAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Lynch and County of Allegheny Are Controlling on the Constitutionality of the
                Pledge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      The Establishment Clause Permits Official Acknowledgments of the Nation's
                Religious Heritage and Character such as the Pledge's Reference to God. . . . . 12

                1.      The phrase "Nation under God" is an acknowledgment of the historical
                        influence of religion, not an endorsement of monotheism. . . . . . . . . . . . 12

                2.      The Pledge statute has a secular purpose. . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Plaintiffs' Other Challenges to 4 U.S.C. § 4 Are Meritless. . . . . . . . . . . . . . . . 17

IV.    THE PLEDGE OF ALLEGIANCE MAY BE RECITED IN PUBLIC SCHOOL CLASSROOMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    The Purpose and Effect of Reciting the Pledge are to Promote Patriotism and National Unity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    B.    The School Districts' Pledge Practices Are Not Unconstitutionally Coercive. . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abington School District v. Schempp, 374 U.S. 203 (1963)................................................ 14, 21

Advanced Management Technology v. FAA, 211 F.3d 633 (D.C. Cir. 2000). ............................ 6

Allen v. Wright, 468 U.S. 737 (1984)................................................................... 2, 3, 4

Becker v. FEC, 230 F.3d 381 (1st Cir. 2000). ........................................................ 6, 7

Bethel School District v. Fraser, 478 U.S. 675 (1986). ................................................ 20

Board of Education v. Grumet, 512 U.S. 687 (1994). ........................................... 11, 24

Board of Education v. Mergens, 496 U.S. 226 (1990)................................................. 16

Brown v. Board of Education, 347 U.S. 483 (1954)................................................... 23

Capitol Square Review & Advisory Board v. Pinette, 515 U.S. 753 (1995). .............................. 13

City of Boerne v. Flores, 521 U.S. 507 (1997). ...................................................... 18

Council of Insurance Agents v. Juarbe-Jimenez, 443 F.3d 103 (1st Cir. 2006). ......................... 5

County of Allegheny v. ACLU, 492 U.S. 573 (1989). ......................................... passim

Crowe v. Bolduc, 365 F.3d 86 (1st Cir. 2004)........................................................ 20

Daimler Chrysler Corp. v. Cuno, 547 U.S. 332 (2006). ................................................ 7

Edwards v. Aguillard, 482 U.S. 578 (1987)........................................................... 13

Elk Grove Unified School District v. Newdow, 542 U.S. 1 (2004)................................. passim

Engel v. Vitale, 370 U.S. 421 (1962)............................................................ 1, 21, 22

Five Flags Pipe Line Co. v. Department of Transportation,
    854 F.2d 1438 (D.C. Cir. 1988). ............................................................... 6

Franklin v. Massachusetts, 505 U.S. 788 (1992). ....................................................... 6

Gary S. v. Manchester Sch. District, 374 F.3d 15 (1st Cir. 2004). ..................................... 18

Gaylor v. United States, 74 F.3d 214 (10th Cir.), cert. denied, 517 U.S. 1211 (1996)............... 13

Habecker v. Town of Estes Park, 452 F. Supp. 2d 1113 (D. Colo. 2006). .............................. 5, 21

In re Tyco International, No. 02-266, 2004 WL 2348315 (D.N.H. Oct. 14, 2004). .......... 4, 6, 8, 9

Lambeth v. Board of Commissioners, 407 F.3d 266 (4th Cir. 2005). .................................. 13, 14

Lee v. Weisman, 505 U.S. 577 (1992)........................................................ 20, 21, 23, 24

Lynch v. Donnelly, 465 U.S. 668 (1984). ............................................................ passim

McCoy v. MIT, 950 F.2d 13 (1st Cir. 1991)................................................................. 20

McCreary County v. ACLU of Kentucky, 545 U.S. 844 (2005)................... 13, 14, 16, 17, 19, 22

Mozert v. Hawkins County Board of Education, 827 F.2d 1058 (6th Cir. 1987)....................... 18

Muirhead v. Mecham, 427 F.3d 14 (1st Cir. 2005). ...................................................... 9

Myers v. Loudoun County Public Schools, 418 F.3d 395 (4th Cir. 2005). .......................... 23, 25

Newdow v. U.S. Congress, 328 F.3d 466 (9th Cir. 2002) (Newdow III),
        rev'd, 542 U.S. 1 (2004). ................................................................... 24

Parker v. Hurley, 514 F.3d 87 (1st Cir. Jan. 31, 2008). ..................................... 17, 18

Puerto Rico v. United States, 490 F.3d 50 (1st Cir. 2007). ........................................ 9

Seminole Tribe v. Florida, 517 U.S. 44 (1996). ......................................................... 11

Sherman v. Community Consolidated Sch. District 21, 980 F.2d 437 (7th Cir. 1992),
        cert. denied, 508 U.S. 950 (1993). ..................................................... 11, 23, 25

Stone v. Graham, 449 U.S. 39 (1980)...................................................................... 22

Texas Monthly, Inc. v. Bullock, 489 U.S. 1 (1989)...................................................... 11

United States v. AVX Corp., 962 F.2d 108 (1st Cir. 1992)......................................... 7, 8

United States v. Seeger, 380 U.S. 163 (1965)........................................................... 14

Valley Forge Christian College v. Americas United for Separation of Church
        and State, 454 U.S. 464 (1982). ........................................................... 4

Van Orden v. Perry, 545 U.S. 677 (2005)................................................. 11, 12, 13, 24

Wallace v. Jaffree, 472 U.S. 38 (1985)...................................................... 11, 17, 21, 22

<u>Warth v. Seldin</u>, 422 U.S. 490 (1975)............................................................................ 7

<u>West Virginia State Board of Education v. Barnette</u>, 319 U.S. 624 (1943)........................... 21, 24

<u>Wirzburger v. Galvin</u>, 412 F.3d 271 (1st Cir. 2005)........................................................ 18

### FEDERAL STATUTES

4 U.S.C. § 4   ......................................................................................................... <u>passim</u>

28 U.S.C. § 1361........................................................................................................ 9

Administrative Procedure Act

 5 U.S.C. § 702 ................................................................................................. 9

 5 U.S.C. § 703 ................................................................................................. 9

Religious Freedom Restoration Act

 42 U.S.C. § 2000bb-1(c)..................................................................................... 9

### STATE STATUTES

N.H. Rev. Stat. Ann. § 194:15-c (2007). ........................................................................ 19

### FEDERAL LEGISLATIVE MATERIALS

H.R. Rep. No. 107-659 (2002)....................................................................................... 17

## INTRODUCTION

We established in our opening brief that Plaintiffs' claims should be dismissed because (i) Plaintiffs lack standing to challenge 4 U.S.C. § 4 on its face; (ii) their claims against the Federal Defendants are barred by the Speech or Debate Clause and/or the doctrine of sovereign immunity; and (iii) on the merits, both 4 U.S.C. § 4 and the defendant school districts' Pledge recitation practices are fully consistent with the Establishment Clause.

To the extent that Plaintiffs actually address our jurisdictional arguments, they do so only superficially.  They muster no meaningful response to our sovereign immunity argument, and no response whatsoever to our Speech or Debate Clause argument.  They cite no case even hinting that the mere codification of the Pledge could cause the type of concrete, particularized injury that is cognizable under Article III.  That is not surprising: Under long-established Supreme Court precedent, the alleged psychological consequences and stigmatic injuries of which Plaintiffs complain are simply not sufficient for standing to ground a facial challenge to 4 U.S.C. § 4.

On the merits, Plaintiffs essentially ignore that the Supreme Court has twice said, without qualification, that the Pledge is consistent with the Establishment Clause.  Lynch v. Donnelly, 465 U.S. 668, 675-77 (1984); County of Allegheny v. ACLU, 492 U.S. 573, 602-03 (1989).  They argue that this case is controlled not by those direct statements, but by dozens of off-point and out-of-context dicta.  They dismiss as "specious" the clear distinction the Supreme Court has drawn, in a line of cases stretching back to Engel v. Vitale, 370 U.S. 421 (1962), between religious exercises, like prayer, which are implicated by the Court's Establishment Clause jurisprudence, and patriotic or ceremonial invocations of God, which are not.  They deny the relevance of the Supreme Court's decision in Elk Grove Unified School District v. Newdow, 542 U.S. 1, 6 (2004), which, in describing the Pledge of Allegiance as a "patriotic exercise," confirmed that its brief reference to God does not

1

convert it into a true religious act.  And they shut their eyes to the reality that, time and again, the Supreme Court has stated that official acknowledgments of our Nation's religious heritage, like that in the Pledge, do not violate the Establishment Clause.

To be sure, the neutrality principle on which Plaintiffs rely finds support in some of the Court's cases.  But it is a fallacy to argue that this principle leaves no room for the patriotic and ceremonial references to God found in many of our Nation's longstanding practices.  The Establishment Clause was not intended to "sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens." County of Allegheny, 492 U.S. at 623 (O'Connor, J., concurring).  "It is far too late in the day to impose [that] crabbed reading of the Clause on the country." Lynch, 465 U.S. at 687.

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING

For the reasons set forth in our opening brief, (i) all Plaintiffs lack standing to mount a facial challenge to 4 U.S.C. § 4; (ii) all Plaintiffs lack standing to challenge the Pledge practices of the Dresden School District and School Administrative Unit 70; and (iii) FFRF lacks standing entirely. See Mem. in Support of Fed'l Defs.' Mot. to Dismiss ("Br.") at 12-21.[1]  Plaintiffs fail to rebut these showings.  Moreover, their argument muddles the distinction between their facial and as-applied challenges and ignores that standing analysis "requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen v. Wright, 468 U.S. 737, 752 (1984) (emphasis added).

---

[1] We do not, however, contest the Doe plaintiffs' standing to bring an as-applied challenge to the Pledge practices of the Hanover School District.  Br. at 12-13.

**A.      All Plaintiffs Lack Standing to Challenge the Federal Pledge Statute on Its Face**

Injury.  Plaintiffs' argument that they suffer a cognizable injury by the mere fact that the

Pledge is codified in its current form, see Pls.' Resp. to Mots. to Dismiss ("Opp'n") at 4-5, 12, 31,

36, is deeply flawed.  They submit that "unwanted exposure to the governmental espousal of

religious dogma" is a "stigmatic injury that suffices for standing purposes" under Allen v. Wright.

See id. at 4-5.  This is a serious misreading of Allen.

In Allen, the Court concluded that similarly abstract allegations of stigmatic injury were

insufficient to establish standing for the parents of African-American public school students to

challenge the IRS's granting of tax exemptions to racially discriminatory private schools.  Although

the students were not personally denied equal treatment by the private schools — indeed, they had

never even applied for admission — they asserted injury from the "mere fact of Government

financial aid to discriminatory private schools." Id. at 752.  Although the Court in Allen recognized

that stigmatic injury is sometimes sufficient to support standing, it explained that such injury

"accords a basis for standing only to 'those persons who are personally denied equal treatment' by

the challenged discriminatory conduct," id. at 755 (citation omitted) — for example, those who are

refused admission to a school or group, id., or who are denied monetary benefits, id. at 757 n.22, or

who suffer harm to "some concrete interest" on a discriminatory basis, id.  Because the students in

Allen had not actually applied to and been rejected by the private schools in question, the stigmatic

injury they alleged was too abstract to be cognizable.  See id. at 755.  A contrary rule, the Court

explained, would mean that "standing would extend nationwide to all members of the particular

racial groups against which the Government was alleged to be discriminating." Id. at 755-56.

Here, Plaintiffs do not — and cannot — identify a "concrete interest" with respect to which

they are discriminatorily treated by virtue of the mere existence of the Pledge statute.  See id. at 757

n.22.  The bare "exposure to . . . religious dogma," without more, is simply too abstract an alleged

stigmatic injury to be cognizable; any other rule would extend standing "nationwide to all members

of the particular [religious] groups against which the Government was alleged to be discriminating,"

a result plainly foreclosed by Allen.  See id. at 755-56.

Plaintiffs assert no other cognizable injury caused by the mere existence of the Pledge statute.

They do not dispute that, even in the Establishment Clause context, the Supreme Court has

consistently "rejected claims of standing predicated on the right, possessed by every citizen, to

require that the Government be administered according to law."  Valley Forge Christian Coll. v.

Ams. United for Separation of Church and State, 454 U.S. 464, 482-83 (1982) (citation and internal

quotation marks omitted); see also Allen, 468 U.S. at 754-55 (same).  And Plaintiffs utterly fail to

address our argument that they lack federal taxpayer standing to challenge the Pledge statute, see Br.

at 15-16 & nn. 5-6, and accordingly concede the point.  See In re Tyco Int'l, No. 02-266, 2004 WL

2348315, at *15 (D.N.H. Oct. 14, 2004) (failure to respond to argument constitutes waiver of right

to object to dismissal on that basis) (citation omitted).[2]

Causation.  Plaintiffs cannot point to an injury that is caused by 4 U.S.C. § 4, which merely

sets forth the wording of the Pledge, and does not require anyone — student or parent, school district

or state legislature — to do anything.  Br. at 13-14.  Plaintiffs dismiss this point as "formalistic" in

view of legislative history suggesting that it was the "intention" of Congress that students would

recite the revised Pledge.  Opp'n at 6.  But regardless of what some Members of Congress may have

intended, Plaintiffs do not, and cannot, dispute that the text of the Pledge statute compels nothing.

---

[2] Plaintiffs' reliance on Elk Grove to establish standing for their facial challenge, see Opp'n at 4, is misplaced.  The Elk Grove Court considered only an as-applied challenge to a school district's Pledge recitation policy, the Ninth Circuit having declined to hold that 4 U.S.C. § 4 violates the Establishment Clause on its face.  542 U.S. at 10; see also Br. at 5-7.

They likewise do not dispute that it is state law, not the Pledge statute, that requires the defendant school districts to set aside time for Pledge recitation — and, even then, only since 2002.  Br. at 13-14.  Plaintiffs' argument that the 1954 Act is the "cause" of alleged injuries that did not begin until 2002 strains the concept of "fair traceability" to its breaking point.  See Council of Ins. Agents v. Juarbe-Jimenez, 443 F.3d 103, 108 (1st Cir. 2006) ("[T]he injury must be fairly traceable to the defendant's challenged action rather than to some third party's independent action."); Habecker v. Town of Estes Park, 452 F. Supp. 2d 1113, 1124 (D. Colo. 2006) (because the Pledge statute "does not compel recitation anywhere, at any time," plaintiff's alleged injury "could not have been caused by [the] Pledge on its face," and plaintiff's "claim, when properly understood, attacks the . . . policy of requiring recitation of the Pledge") (citation and internal quotation marks omitted), appeal pending, No. 06-1515 (10th Cir.) (argued Oct. 4, 2007).

     Redressability.  Plaintiffs appear to misunderstand our redressability argument.  We do not dispute that, in an appropriate case, this Court would have the authority to declare a federal statute unconstitutional or to order a local school district to refrain from an unconstitutional practice.  Cf. Opp'n at 7-9.  Indeed, the judiciary routinely reviews Acts of Congress and at times declares them unconstitutional.  As Plaintiffs' own string citation demonstrates, however, when such cases involve federal defendants they are brought against Executive Branch agencies or officials — that is, against those who, in the course of administering a statute, take some action that injures the plaintiff and against whom redress may be had.  See Opp'n at 8.

     Here, by contrast, Plaintiffs seek an injunction requiring Congress itself to "immediately act to remove the words 'under God' from the Pledge . . . as now written in 4 U.S.C. § 4."  Compl. ¶ IV.  Congress is not an appropriate defendant, and we remain unaware of any case in which a Court has attempted to redress an injury caused by an allegedly unconstitutional statute by purporting to order

5

Congress to repeal or amend the challenged law.  See Br. at 16-17; Franklin v. Massachusetts, 505 U.S. 788, 829 (1992) (Scalia, J., concurring) ("[W]e cannot direct . . . Congress to perform particular legislative duties.").

Plaintiffs also seek an injunction requiring the United States to "use its power to remove the words 'under God' from the United States Code as now written in 4 U.S.C. § 4."  Compl. ¶ V. However, Plaintiffs offer no response to our argument that, even if the Court were to order the United States to somehow "remove" "under God" from the United States Code, the Statutes at Large would still contain those words and the current Pledge would thus remain the law.  Br. at 17 (citing, inter alia, Five Flags Pipe Line Co. v. Dep't of Transp., 854 F.2d 1438, 1440 (D.C. Cir. 1988)). Thus, Plaintiffs concede that this claim is unredressable.  See In re Tyco, 2004 WL 2348315, at *15.

**B.      All Plaintiffs Lack Standing to Sue the Dresden School District and School Administrative Unit 70**

Actual or imminent injury.  Plaintiffs lack standing to sue the Dresden School District and School Administrative Unit 70 because no Plaintiff attends a school operated by either district and, therefore, Plaintiffs are not "injured" by those districts' Pledge practices.  Br. at 17-18.  Plaintiffs respond that, "[i]f the Court requires," they will amend the Complaint to allege that DoeChild-1 will "undoubtably" matriculate in a school run by the Dresden School District and School Administrative Unit 70 "before this litigation terminates" and, thus, they meet the mootness exception for disputes capable of repetition yet evading review.  Opp'n at 9-10.

Plaintiffs' argument conflates the doctrines of standing and mootness.  As the First Circuit has explained, "'standing is assessed at the time the action commences,' whereas mootness concerns whether 'a judiciable controversy existed but no longer remains.'"  Becker v. FEC, 230 F.3d 381, 389 (1st Cir. 2000) (quoting Advanced Mgmt. Tech. v. FAA, 211 F.3d 633, 636 (D.C. Cir. 2000));

see also id. at 386 n.3 (collecting cases).  Here, there is not, and never has been, a "judiciable controversy" involving the Dresden School District or School Administrative Unit 70 because, "at the time the action commence[d]," no Plaintiff attended a school operated by either district.  See id.

Moreover, the Complaint provides no basis for the Court to conclude that there is anything "impending" or "certain" about DoeChild-1's eventual plans to enroll in a school run by either district.  See Daimler Chrysler Corp. v. Cuno, 547 U.S. 332, 345 (2006).  It is Plaintiffs' burden "clearly to allege facts demonstrating" an actual or imminent injury, Warth v. Seldin, 422 U.S. 490, 518 (1975), and such facts "cannot be 'inferred argumentatively from averments in the pleadings,'" United States v. AVX Corp., 962 F.2d 108, 114 (1st Cir. 1992) (citation omitted), let alone from Plaintiffs' opposition brief.  Plaintiffs have failed to meet their burden to plead with "heightened specificity" "where standing is at issue," and their "optimistic predictions" are insufficient to remedy this defect.  See id. at 115.

Cognizable injury.  Finally, Plaintiffs appear to concede that they lack state or municipal taxpayer standing to sue the Dresden School District and School Administrative Unit 70.  See Br. at 18-20 & n.7.  For all of these reasons, the Court should dismiss both districts from this lawsuit.

## C.   FFRF Lacks Standing to Raise Any Claim in This Case

FFRF lacks associational standing because it failed to allege a particularized injury to any one of its members that is sufficient to meet the requirements of Article III.  Br. at 20-21.  Plaintiffs argue that our reliance on AVX is misplaced because "the Does are FFRF members."  Opp'n at 10.  But the Complaint certainly does not allege that.  Instead, the Complaint states that "[m]embers of FFRF — in addition to plaintiffs Doe — live in, pay taxes in, and have children (or are children) who attend public schools in this judicial district.  Those other (non-Doe) members suffer the same or similar harms as alleged in this Complaint."  Compl. ¶ 9.  It later states that "FFRF represents its

members, including others besides the Does, who suffer the same or similar injuries that the Doe [p]laintiffs endure."  Id. ¶ 24.  Nowhere does the Complaint actually allege that the Does are members of FFRF.  Again, the facts necessary to support standing "must clearly appear in the record" and "cannot be inferred argumentatively."  AVX, 962 F.2d at 115.  Plaintiffs' vague allegations do not begin to approach the degree of "heightened specificity" that the First Circuit requires when standing is at issue.  See id.

## II.   THE FEDERAL DEFENDANTS ARE IMMUNE FROM PLAINTIFFS' CLAIMS

### A.   Plaintiffs' Claims Against Congress Are Barred by the Speech or Debate Clause

In our opening brief, we established that the relief Plaintiffs seek against Congress — specifically, (i) a declaration that "Congress, in passing the Act of 1954, violated the Establishment and Free Exercise Clauses"; (ii) a declaration that the inclusion of the words "under God" in the Pledge violates the Establishment and Free Exercise Clauses, the Equal Protection component of the Fifth Amendment, and RFRA; and (iii) an injunction requiring Congress to "immediately act to remove the words 'under God' from the Pledge . . . as now written in 4 U.S.C. § 4" — is barred by the Constitution's Speech or Debate Clause.  Br. at 21-22.  Plaintiffs fail to address our Speech or Debate Clause argument, and thus concede the point.  See In re Tyco, 2004 WL 2348315, at *15.  For this reason, and for the reasons set forth in our opening brief, the Court should dismiss Congress from this action for lack of jurisdiction.

### B.   Plaintiffs' Constitutional Claims Against the Federal Defendants Are Barred by Sovereign Immunity

In our opening brief, we also demonstrated that Plaintiffs' constitutional claims against all the Federal Defendants are barred by sovereign immunity.  Br. at 23-24 & nn. 9-11.  Plaintiffs' only response is that "'judicial review may be brought against the United States' under 5 U.S.C. § 703."

Opp'n at 9.  They cite no case law and offer no further analysis on the point.

Plaintiffs are mistaken.  It is 5 U.S.C. § 702, not § 703, that provides the waiver of sovereign immunity under the Administrative Procedure Act.  Section 703 describes the "form of proceeding for judicial review" and provides that an "action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer."  5 U.S.C. § 703.  Thus, § 703 merely describes the parties that, in an appropriate case, may be named as defendants.  See also id. § 702 ("The United States may be named as a defendant in any such action . . . .").  Section 702, by contrast, plainly waives the immunity of the United States only in actions "stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity."  5 U.S.C. § 702; see Br. at 24 n.10 (citing Puerto Rico v. United States, 490 F.3d 50, 57-58 (1st Cir. 2007) (waiver applies to actions for relief "against a Federal agency or officer acting in an official capacity"), and Muirhead v. Mecham, 427 F.3d 14, 18 (1st Cir. 2005) (same)).  Here, Plaintiffs name no federal agency or official, presumably because 4 U.S.C. § 4 merely sets forth the words of the Pledge, and neither requires nor authorizes any federal agency or official to do anything.  Accordingly, the APA supplies no waiver of sovereign immunity in this case.  For this reason, and those set forth in our opening brief, the Federal Defendants are immune from Plaintiffs' constitutional claims,[3] and the Court lacks jurisdiction to consider them.

---

[3] Plaintiffs also submit that "RFRA provides its own waiver of sovereign immunity."  Opp'n at 9.  While that is correct, as set forth in our opening brief, see Br. at 24 n.9, although we do not concede that the relief Plaintiffs seek constitutes "appropriate relief" contemplated by RFRA's waiver of sovereign immunity, see 42 U.S.C. § 2000bb-1(c), the Court need not address that issue, for Plaintiffs' RFRA claim is barred as against Congress by the Speech or Debate Clause, see supra Part II.A, and fails on the merits as discussed infra at note 9.

Moreover, Plaintiffs fail to address our argument that the mandamus statute, 28 U.S.C. § 1361, does not waive the sovereign immunity of the United States or Congress, see Br. at 24 n.11, and accordingly concede the point.  See In re Tyco, 2004 WL 2348315, at *15.

## III.    4 U.S.C. § 4 IS CONSTITUTIONAL

The Supreme Court has said without qualification, in two different majority opinions, that the Pledge is consistent with the Establishment Clause, and has used the Pledge as a baseline for weighing the constitutionality of other forms of government action.  See Lynch, 465 U.S. at 675-77; County of Allegheny, 492 U.S. at 602-03.  Plaintiffs essentially ignore these two cases, as they ignore the many others in which the Supreme Court and individual Justices have reaffirmed that patriotic and ceremonial references to God, such as the one in the Pledge, do not offend the Establishment Clause.  But those decisions are binding on this Court and compel dismissal of Plaintiffs' 4 U.S.C. § 4 challenge.

### A.    Lynch and County of Allegheny Are Controlling On the Constitutionality of the Pledge

It cannot be disputed that the Supreme Court expressly and unqualifiedly approved the Pledge of Allegiance in both Lynch and County of Allegheny.  See Lynch, 465 U.S. at 675, 677 (the words "under God" in the Pledge are an "acknowledgment of our religious heritage," similar to the "official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers," which are "replete" in our Nation's history); County of Allegheny, 492 U.S. at 602-03 (reaffirming Lynch's approval of the reference to God in the Pledge, and noting that all of the Justices in Lynch viewed the Pledge as "consistent with the proposition that government may not communicate an endorsement of religious belief") (citations omitted).

Plaintiffs argue that Lynch and County of Allegheny merely referred to the Pledge "in passing."  Opp'n at 57.  To the contrary, as our opening brief explained, Br. at 25-29, both Lynch and County of Allegheny used the Pledge as a benchmark for evaluating the constitutionality of the religious displays at issue there.  Thus, both Lynch and County of Allegheny are controlling

precedent on the Pledge's constitutionality.  See Seminole Tribe v. Florida, 517 U.S. 44, 67 (1996)

("When an opinion issues for the [Supreme] Court, it is not only the result but also those portions

of the opinion necessary to that result by which we are bound."); Sherman v. Comm'y Consol. Sch.

Dist. 21, 980 F.2d 437, 448 (7th Cir. 1992) ("If the [Supreme] Court proclaims that a practice is

consistent with the establishment clause, we take its assurances seriously."), cert. denied, 508 U.S.

950 (1993).

Plaintiffs urge this Court to rely not on the direct statements in Lynch and County of

Allegheny regarding the constitutionality of the Pledge, but rather on "principled dicta" in various

other Supreme Court cases.  Plaintiffs note four cases in which concurring or dissenting Justices

have criticized certain aspects of the Court's Establishment Clause jurisprudence that might call

into question the Pledge's constitutionality if applied to the Pledge.[4]  None of these opinions is any

help to Plaintiffs, however, because each clearly took the position that the Pledge of Allegiance is

constitutional.  Thus, each of these opinions falls into line with Lynch and County of Allegheny,

which approved the Pledge, as well as with the opinions of the various other individual Justices who

have stated that the Pledge is consistent with the Establishment Clause.  See Br. at 28 n.13.

As the Supreme Court has frequently emphasized, its Establishment Clause jurisprudence

is highly context-specific.  See, e.g., Lynch, 465 U.S. at 679 (noting that the focus of the Court's

inquiry "must be on the creche in the context of the Christmas season"); Board of Educ. v. Grumet,

512 U.S. 687, 720 (1994) (O'Connor, J., concurring) ("There are different categories of

Establishment Clause cases, which may call for different approaches."); Van Orden v. Perry, 545

---

[4] See Opp'n at 58-59 (citing Wallace v. Jaffree, 472 U.S. 38, 88 (1985) (Burger, C.J., dissenting); Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 29-30 (1989) (Scalia, J., dissenting); County of Allegheny, 492 U.S. at 674 n.10 (Kennedy, J., dissenting)); id. at 40 (citing Elk Grove, 542 U.S. at 48 (Thomas, J., concurring)).

U.S. 677, 699 (2005) (Breyer, J., concurring in the judgment) (there is "no single mechanical formula that can accurately draw the constitutional line in every case").  Plaintiffs thus invite the Court to err by relying on general pronouncements about what the Establishment Clause requires in <u>other</u> contexts.  The most reliable guide to resolving any Establishment Clause issue is to ascertain what the Supreme Court has said about that particular issue.  Here, as we have explained, the Supreme Court's specific statements about the Pledge of Allegiance all point to the same conclusion: the Pledge, like numerous other official acknowledgments of religion, is fully constitutional.

### B.   The Establishment Clause Permits Official Acknowledgments of the Nation's Religious Heritage and Character such as the Pledge's Reference to God

The balance of Plaintiffs' argument that 4 U.S.C. § 4 violates the Establishment Clause on its face reduces to two principal points: (1) that the words "under God" constitute an endorsement of religion; and (2) that Congress lacked a secular purpose when in 1954 it added those words to the Pledge statute.  Both contentions are incorrect.

### 1.   The phrase "Nation under God" is an acknowledgment of the historical influence of religion, not an endorsement of monotheism

Plaintiffs' refrain is that the Pledge's reference to a Nation "under God" amounts to a governmental endorsement of Judeo-Christian monotheism.  But there is a constitutional difference between <u>acknowledgment</u> of the role that belief in God has played in the Nation's history and <u>endorsement</u> of God or monotheism. <u>See</u> <u>Lynch</u>, 465 U.S. at 674-78.  The Pledge's brief reference to a generic God is a permissible acknowledgment, not an unconstitutional endorsement.

Indeed, "[o]ur history is replete with official references to the value and invocation of Divine guidance," and "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." <u>Lynch</u>, 465 U.S. at 674, 675; <u>accord</u> <u>Van Orden</u>, 545 U.S. at 687 (plurality opinion) (describing <u>Lynch</u> and other Supreme Court

decisions as "[r]ecogni[zing] . . . the role of God in our Nation's heritage"); id. at 699 (Breyer, J.,

concurring in the judgment) ("[T]he Establishment Clause does not compel the government to purge

from the public sphere all that in any way partakes of the religious."). Such official

acknowledgments of religion — which include, among other things, references to divinity in our

Nation's symbols, songs, mottos, oaths, buildings, court cries, and on our coins — are consistent

with the Establishment Clause because they take note of the historical fact that "religion permeates

our history." Edwards v. Aguillard, 482 U.S. 578, 607 (1987) (Powell, J., concurring).[5] Because

of their "'history and ubiquity,'" these types of acknowledgments "are not understood as conveying

an endorsement of particular religious beliefs." County of Allegheny, 492 U.S. at 625 (O'Connor,

J., concurring) (citation omitted).

Moreover, whether the Pledge endorses monotheism from a constitutional perspective turns

upon the perceptions of an objective, reasonable observer, not on the reaction of "isolated

nonadherents," or whether "some people may be offended by the display," or even "whether some

reasonable person might think [the State] endorses religion." Capitol Square Rev. & Advisory Bd.

v. Pinette, 515 U.S. 753, 779-80 (1995) (O'Connor, J., concurring) (alteration in original); Gaylor,

74 F.3d at 217. That objective observer is charged with an awareness of our "unbroken history"

(Lynch, 465 U.S. at 674) of similarly phrased references to the Nation's religious heritage in, for

example, the Declaration of Independence ("Creator"), the National Anthem ("God"), and on our

coins ("In God we trust"). See McCreary County v. ACLU of Ky., 545 U.S. 844, 866 (2005)

(rejecting standard of "an absentminded objective observer" for "one presumed to be familiar with

---

[5] See also Gaylor v. United States, 74 F.3d 214, 217-18 (10th Cir.) ("In God we trust" on currency does not violate the Establishment Clause), cert. denied, 517 U.S. 1211 (1996); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 273 (4th Cir.) ("In God We Trust" on government building does not violate the Establishment Clause), cert. denied, 546 U.S. 1015 (2005).

the history of the government's actions and competent to learn what history has to show"); Lambeth, 407 F.3d at 271-72.[6] That objective observer is likewise charged with an understanding of the Pledge's "place in our Nation's cultural landscape" as "our most routine ceremonial act of patriotism." Elk Grove, 542 U.S. at 35, 38 (O'Connor, J., concurring).[7]

Finally, the objective observer would view the 31-word Pledge as a whole, and not focus solely, like Plaintiffs, on the two words "under God." Plaintiffs' argument to the contrary ignores the Supreme Court's admonition that, shorn of context, "the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause." Lynch, 465 U.S. at 680; accord Van Orden, 545 U.S. at 701-02 (Breyer, J., concurring in the judgment) (the Establishment Clause "inquiry requires us to consider the context of the [Ten Commandments] display"). Plaintiffs' effort to argue the extreme — that, taken to absurd lengths, a broad enough context would

---

[6] Plaintiffs seriously misread history when, quoting from Justice Brennan's concurrence in Abington School District v. Schempp, 374 U.S. 203 (1963), they characterize historical evidence regarding the government's practice of officially acknowledging the role of religion in national life as "ambiguous." See Opp'n at 43 (quoting Schempp, 374 U.S. at 237 (Brennan, J., concurring)). Justice Brennan used that word to describe historical evidence regarding whether the Founders intended the Establishment Clause to forbid "devotional exercises in the public schools." Id. at 234-35. While the historical record may show that, at the framing, the Establishment Clause had "edges still to be determined," McCreary, 545 U.S. at 879, the practice of officially acknowledging the role of religion in national life dates back to "at least 1789," Lynch, 465 U.S. at 674, and is directly relevant in analyzing whether a reasonable observer familiar with that history would view the Pledge as endorsing a particular religious belief.

[7] There also is an established legal tradition under which references to "God" are understood in non-exclusionary terms. See, e.g., County of Allegheny, 492 U.S. at 602-03 (expressly describing the Pledge's reference to "God" as "nonsectarian"); United States v. Seeger, 380 U.S. 163, 175-76 (1965) (discussing inclusiveness of the term "God" and stating that "'God' ha[s] myriad meanings for men of faith"); Elk Grove, 542 U.S. at 42 (O'Connor, J., concurring in the judgment) ("[The Pledge] does not refer to a nation 'under Jesus' or 'under Vishnu,' but instead acknowledges religion in a general way: a simple reference to a generic 'God.'"). Plaintiffs' argument, by contrast, relies upon the perceptions of an unreasonable observer, one who would view "under God" as the equivalent of "under Rev. Sung Myung Moon." Opp'n at 37.

immunize any Establishment Clause violation, <u>see</u> Opp'n 15-19 — merely highlights the obvious: the relevant context here is the entire Pledge of Allegiance.  When read as a whole, the Pledge is reasonably understood not as establishing a state religion, but as celebrating the Nation and acknowledging the historical forces and ideals that formed its unique character.

### 2.     The Pledge statute has a secular purpose

Plaintiffs have acknowledged that the Pledge of Allegiance furthers the secular goals of promoting patriotism and national unity.  <u>See</u> Compl. ¶ 71; Br. at 37-38.  However, they devote a substantial part of their opposition to attacking the legislative history of the 1954 Act that added the Pledge's reference to God.  <u>See</u> Opp'n at 31-33; <u>id.</u> App. I at 1-9.  They contend that the legislative history establishes that the words "under God" were added to the Pledge "for nothing but unambiguously religious reasons."  <u>Id.</u> at 33.  That is simply inaccurate.

As we have explained at length, the Committee Reports indicate that Congress viewed the amendment as a permissible acknowledgment that, "[f]rom the time of our earliest history our peoples and our institutions have reflected the traditional concept that our Nation was founded on a fundamental belief in God."  Br. at 38 (citations omitted).  Accordingly, those reports trace the numerous references to God in historical documents central to the founding and preservation of the United States, from the Mayflower Compact to the Declaration of Independence to the Gettysburg Address.  <u>Id.</u> at 38-39 (citations omitted).  Congress intended to highlight a foundational difference between the United States and communist nations: that "[o]ur American Government is founded on the concept of the individuality and the dignity of the human being," and that "[u]nderlying this concept is the belief that the human person is important because he was created by God and endowed by Him with certain inalienable rights which no civil authority may usurp."  <u>Id.</u> at 39 (citations omitted).  Thus, Congress added "under God" to the Pledge to emphasize the Framers' <u>political</u>

philosophy concerning the sovereignty of the individual.  This is certainly a secular purpose.

Plaintiffs ignore these express statements in the Committee Reports in favor of various statements in the Congressional Record by certain Members of Congress.  See, e.g., Opp'n App. I. We have acknowledged that some Members may have been motivated to vote for the amendment in part by their religious beliefs.  Br. 39; cf. Elk Grove, 542 U.S. at 25-26 (Rehnquist, C.J., concurring in the judgment) (other than the amendment's sponsor, "[w]e do not know what other Members of Congress thought about the purpose of the amendment").  But as Justice O'Connor noted in Elk Grove, the "intentions" of these legislators "cannot, on their own, decide [the] inquiry." 524 U.S. at 41 (opinion concurring in the judgment).  For one thing, "those legislators also had permissible secular objectives in mind — they meant, for example, to acknowledge the religious origins of our Nation's belief in the 'individuality and the dignity of the human being.'"  Id. (citation omitted).  For another, the Establishment Clause focuses on "the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law."  Board of Educ. v. Mergens, 496 U.S. 226, 249 (1990) (emphasis added).

Moreover, Congress's stated purpose in amending the Pledge in 1954 — to acknowledge the historical influence of religion on our Nation, and to emphasize the Framers' political philosophy that the unalienable rights of man were God-given — is entitled to deference.  See McCreary, 545 U.S. at 864-65 ("[I]n keeping with the respect owed in the first instance to such official claims," a "legislature's stated reasons will generally get deference" where "the secular purpose required [is] genuine, not a sham, and not merely secondary to a religious objective.").  Although Plaintiffs contend that Congress "misidentified the distinguishing feature" between the American and Communist societies when — in the midst of the Cold War — it modified the Pledge statute, they acknowledge that the effort to highlight the differences between these societies was a "worthy

ambition." Opp'n at 35. Given this context, Congress's stated purpose was quite clearly "serious," McCreary, 545 U.S. at 865 n.11, and by no means a "sham," id. at 864.

Finally, it bears repeating that Congress recently reenacted the Pledge statute, making extensive findings about the historic role of religion in the political development of the Nation, and reaffirming that the federal government's contemporary purpose for retaining the Pledge, including its reference to God, advances the legitimate purpose of "acknowledgment of the religious heritage of the United States." H.R. Rep. No. 107-659, at 4. Thus, the federal government's modern-day purpose for retaining the Pledge intact is secular.[8] As Justice O'Connor summarized in Elk Grove, "the subsequent social and cultural history of the Pledge shows that its original secular character was not transformed by its amendment" in 1954. Elk Grove, 542 U.S. at 41 (opinion concurring in the judgment). "[O]ur continued repetition of the reference to 'one Nation under God' in an exclusively patriotic context has shaped the cultural significance of that phrase to conform to that context." Id.

## C.      Plaintiffs' Other Challenges to 4 U.S.C. § 4 Are Meritless

Plaintiffs insist that their separate claim under the Free Exercise Clause is "valid" but cite no case law and fail to argue the point. Opp'n at 69. As we explained in our opening brief, a Free Exercise claim depends on a showing of compulsion, and the Pledge statute, on its face, compels nothing. Br. at 35-36. The First Circuit recently confirmed this in Parker v. Hurley, 514 F.3d 87 (1st

---

[8] In assessing Congress's purpose, moreover, it is of no moment that, as Plaintiffs note, the Pledge initially was enacted without the words "under God." Opp'n at 18. In Lynch, the Court dismissed as "irrelevant" a similar argument relating to whether "the city's objectives could have been achieved without including the [challenged] creche in the [holiday] display." 465 U.S. at 681 n.7. "The question," the Court said, is "whether the [government action at issue] violates the Establishment Clause." Id. Plaintiffs' further attempt to analogize the 1954 amendment to the insertion of the words "or voluntary prayer" into the moment-of-silence statute in Wallace, Opp'n at 50-51, also misses the mark. In Wallace, "[t]he State did not present evidence of any secular purpose." 472 U.S. at 57.

Cir. Jan. 31, 2008).  The plaintiffs in Parker raised Free Exercise and Due Process challenges to a Massachusetts school district's failure to provide them with an opportunity to exempt their children from classroom exposure to books whose portrayal of same-sex marriage they found "religiously repugnant."  Id. at 90.  In rejecting the plaintiffs' Free Exercise claim, the Court relied on Mozert v. Hawkins County Board of Education, 827 F.2d 1058 (6th Cir. 1987), which we cited in our brief, Br. at 35-36, in which the Sixth Circuit found that the mere "exposure to ideas" does "not constitute a constitutionally significant burden on the plaintiffs' free exercise of religion."  Parker, 514 F.3d at 105 (citing Mozert, 827 F.2d at 1065).  The Parker court's conclusion was unambiguous: "Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas, or even participate in discussions about them."  Id. at 106.[9]  It is undisputed that neither 4 U.S.C. § 4 nor the school districts' Pledge practices "requires" the Doe children to recite the Pledge.[10]

---

[9] Plaintiffs concede, as they must, that their RFRA claim against the school districts is barred by City of Boerne v. Flores, 521 U.S. 507 (1997), see Opp'n at 70, but maintain that it survives against the Federal Defendants.  But as we have explained, Br. at 36 n.16, the hallmark of a "substantial burden" under RFRA, just as under the Free Exercise Clause, is compulsion; where there is no compulsion, and hence no Free Exercise violation, there is no RFRA claim.  See Gary S. v. Manchester Sch. Dist., 374 F.3d 15, 21-22 (1st Cir. 2004) (where there is "no cognizable burden on religion" under the Free Exercise Clause, there is "no occasion to apply RFRA").  The distinction on which Plaintiffs rely — that Gary S. addressed a RFRA claim against a private school district rather than a public one, see Opp'n at 70 — is inconsequential.

[10] Plaintiffs' Equal Protection claim should be rejected for the reasons set forth in our opening brief, Br. at 36 n.17, to which we add only that our statement that neither religion nor irreligion has ever been held to be a suspect classification is hardly "without foundation" as Plaintiffs indicate.  Opp'n at 71.  Plaintiffs evidently ignore our citation to Wirzburger v. Galvin, 412 F.3d 271, 285 (1st Cir. 2005).  Br. at 36 n.17.

IV.     THE PLEDGE OF ALLEGIANCE MAY BE RECITED IN PUBLIC
        SCHOOL CLASSROOMS

To the extent that Plaintiffs' as-applied challenge to the defendant school districts' Pledge practices overlaps with their facial challenge to 4 U.S.C. § 4 — and the overlap is considerable — it fails for all the reasons discussed above.  Otherwise, Plaintiffs' as-applied challenge boils down to two principal assertions: (i) that the school districts' Pledge practices have the impermissible purpose or effect of advancing religion, see Opp'n at 13-14, 36-38; and (ii) that the school context renders Pledge recitation inherently coercive and unconstitutional, see Opp'n at 40, 46-47, 62-66. Both assertions are wrong.

A.      The Purpose and Effect of Reciting the Pledge are to Promote Patriotism and
        National Unity

In weighing Plaintiffs' as-applied challenge, the purpose inquiry must focus on the school districts' reasons for leading students in voluntary Pledge recitation.  Plaintiffs do not dispute that the school districts' Pledge practices simply comply with a New Hampshire statute that requires each school district in the State to "authorize a period of time during the school day for the recitation of the pledge of allegiance."  N.H. Rev. Stat. Ann. § 194:15-c (2007).  Nor do they challenge that the legislative purpose of the statute, as stated in its text, is to further a "policy of teaching our country's history" to elementary and secondary school students.  Id.  And they offer nothing to suggest that any state lawmaker or school official had any other purpose in mind.  Thus, the state legislature's statement of purpose, like that of Congress, is entitled to deference.  See McCreary, 545 U.S. at 864.

Moreover, Plaintiffs do not dispute that recitation of the Pledge of Allegiance furthers the secular goals of promoting patriotism and national unity, particularly given the charge that "[p]ublic education must prepare pupils for citizenship in the Republic."  Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 681 (1986).  Yet they argue that the version of the Pledge of Allegiance that has been recited

in public schools for decades is not patriotic but religious, Opp'n at 13, with the implication that the school districts' purpose in leading Pledge exercises cannot be secular.  But this flies in the face of the Supreme Court's recognition in <u>Elk Grove</u> that

> the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes.  <u>Its recitation is a patriotic exercise</u> designed to foster national unity and pride in those principles.

<u>Elk Grove</u>, 542 U.S. at 6 (emphasis added).  Plaintiffs' suggestion that <u>Elk Grove</u> "provides no guidance" on the issue is mistaken.  Opp'n at 42.  Such "carefully considered statements of the Supreme Court, even if technically dictum, must be accorded great weight and should be treated as authoritative." <u>Crowe v. Bolduc</u>, 365 F.3d 86, 92 (1st Cir. 2004); <u>see also</u> <u>McCoy v. MIT</u>, 950 F.2d 13, 19 (1st Cir. 1991).  Just as the Pledge's brief reference to a generic God does not convert its recitation from a patriotic exercise to a religious act, neither does it transform the school districts' avowedly secular purpose into an impermissibly religious one.[11]

## B.     The School Districts' Pledge Practices Are Not Unconstitutionally Coercive

We established in our opening brief that the coercion principles applied in <u>Lee v. Weisman</u>, 505 U.S. 577 (1992), "have no relevance here, because the Pledge is a patriotic utterance, not a religious one."  <u>Habecker</u>, 452 F. Supp. 2d at 1124 (rejecting Establishment Clause challenge).  Instead, it is <u>West Virginia State Board of Education v. Barnette</u>, 319 U.S. 624 (1943), not <u>Lee</u>, that

---

[11] Relying on "social science data" presented in an amicus brief that was filed in the Supreme Court in <u>Elk Grove</u>, Plaintiffs contend that the Pledge's primary effect is to "inculcate . . . children with the belief that God exists."  Opp'n at 36-37 & n.24 (citation omitted).  As the United States advised the Supreme Court in <u>Elk Grove</u>, however, that amicus brief provided a seriously misleading account of the data in question.  <u>See</u> Reply Brief for the United States as Respondent Supporting Petitioners, <u>Elk Grove</u>, 2004 WL 522593, at *13 (noting that the data actually show that "[w]hile some children perceived the Pledge as a prayer, others in amicus's studies did not," and that "the overall curricular context — in which the Pledge is recited in conjunction with the study of civics and national history — leads students to view the Pledge and its text in purely patriotic terms").

establishes the relevant standard for analyzing whether a school's Pledge practices safeguard the "opt-out" rights of students.  Under Barnette, it is only compelled recitation without the possibility of opting out — the coerced "confess[ion] by word or act," id. at 642 — that transgresses constitutional bounds.  Here, because the school districts' Pledge practices make recitation fully voluntary, Barnette forecloses Plaintiffs' claim of unconstitutional coercion.  See Elk Grove, 542 U.S. at 7-8 (noting that Barnette is satisfied when "students who object on religious grounds" are permitted "to abstain from [Pledge] recitation"); see generally Br. at 46-48.

Plaintiffs sidestep this argument entirely.  They label the distinction between patriotic or ceremonial invocations of God and true religious exercises a "straw man."  Opp'n at 20.  But the Supreme Court has consistently drawn the same distinction.  See Engel, 370 U.S. at 435 n.21 (contrasting "patriotic or ceremonial" "references to the Deity," such as those in our founding documents and national anthems, with the "unquestioned religious exercise" of school-sponsored prayer); Schempp, 374 U.S. at 223 (deeming the reading of Bible verses and the Lord's Prayer a "religious ceremony," but saying nothing about Pledge recitation, which immediately followed); Wallace, 472 U.S. at 58-59 (statute seeking "to return prayer to the public schools" is of a "wholly religious character"); Lee, 505 U.S. at 588 (finding graduation prayer an "overt religious exercise," but not questioning the Pledge recitation that preceded it).  As Lee itself recognized, its coercion principles are implicated only when "State officials direct the performance of a formal religious exercise."  Lee, 505 U.S. at 586 (emphasis added); see also Br. at 47.  Unlike the religious exercises in Engle, Schempp, Wallace, and Lee, the Pledge is, of course, a "patriotic exercise."  Elk Grove, 542 U.S. at 6.  Plaintiffs' refusal to accept this distinction fatally infects their analysis.

Plaintiffs rely heavily on what they contend are four "on-point" Supreme Court decisions.  Opp'n at 45-56.  Each is decidedly off the mark.  For example, in Engel, which Plaintiffs describe

21

as "essentially identical" to this case, Opp'n at 47, the Court held that public schools may not lead students in reciting an official prayer.  420 U.S. at 424.  That prayer read: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."  Id. at 422.  Plaintiffs acknowledge that this is a prayer while the Pledge "allegedly" is not, but call this distinction "specious."  Opp'n at 48.  Yet the distinction is the Engel Court's own.  420 U.S. at 435 n.21 (contrasting "patriotic or ceremonial" "references to the Deity," such as those in our founding documents and national anthems, with the "unquestioned religious exercise" of school-sponsored prayer).  Plaintiffs' hyperbolic suggestion that the Pledge must also be a prayer because a public school teacher could not permissibly lead a class in saying the phrase "We are one Nation under God" is beside the point.  Opp'n at 48.[12]  The defendant school districts invite their students to recite the Pledge in its entirety, not just the words "under God," and, as we have shown, the constitutionality of religious content must be evaluated in context.

Wallace v. Jaffree, 472 U.S. 38 (1985), the second case Plaintiffs maintain is "directly on point," Opp'n at 50, never actually mentions the Pledge.  Moreover, that case is distinguishable for the same reasons Engel is distinguishable — it involves the context of school prayer, as opposed to what the Supreme Court in Elk Grove described as "patriotic" speech.

Plaintiffs' third "on-point" case, County of Allegheny, Opp'n at 51, addressed the display of a creche at a county courthouse, and the Court's majority opinion, as we have explained, took pains to note that all of the Justices in Lynch viewed the Pledge as "consistent with the proposition

---

[12] Plaintiffs also suggest that it should be irrelevant that the Pledge is not a religious act because the Ten Commandments displays the Supreme Court struck down in Stone v. Graham, 449 U.S. 39 (1980), and McCreary were not religious exercises.  See Opp'n at 20.  The Supreme Court did not rely on the coercion test at all, however, in either Stone or McCreary.  Rather, it held that the religious displays in both cases lacked a valid secular purpose.  Thus, neither case is relevant to the question whether recitation of the Pledge in public schools is unconstitutionally coercive.

that government may not communicate an endorsement of religious belief." 492 U.S. at 602-03; see also id. at 603 (noting the "obvious distinction" between creche displays and the "nonsectarian references" to God in the Motto and Pledge).

Plaintiffs' fourth "on-point" case is Brown v. Board of Education, 347 U.S. 483 (1954). See Opp'n at 53 (arguing that "animus toward Atheists is greater than that toward any other minority, racial or otherwise"). Plaintiffs' citation of Brown requires no response, other than to note that Brown did not involve the Pledge of Allegiance and was not even an Establishment Clause case. Neither the Pledge statute nor the school districts' Pledge practices requires Plaintiffs to do anything, prohibits them from doing anything, deprives them of any tangible benefit, or affects their opportunities in any cognizable way. Cf. Brown, 347 U.S. at 486 n.1 (describing plaintiffs as African-American children forced by racially discriminatory laws to attend segregated schools).

Plaintiffs' attempt to discredit Sherman and Myers v. Loudoun County Public Schools, 418 F.3d 395 (4th Cir. 2005), as "illogical" and "intellectually dishonest" efforts to reach a "desired conclusion" is transparent. Opp'n at 65, 68. In rejecting Establishment Clause challenges to state Pledge recitation statutes, the Fourth and Seventh Circuits simply recognized what Plaintiffs will not: that Lee's coercion principles are triggered only by true religious exercises, and that the Pledge's brief reference to a generic God does not convert its recitation from a patriotic act to a religious one. Id. at 407 ("[D]istinguishing this case from Engel and its progeny is the simple fact that the Pledge, unlike prayer, is not a religious exercise or activity, but a patriotic one."); Sherman, 980 F.2d at 445 (asking whether "'under God' make[s] the Pledge a prayer" and concluding that the Founders did not deem such "ceremonial invocations of God as 'establishment'").

Like Plaintiffs, the Ninth Circuit failed to recognize this distinction. That court's decision in Newdow v. U.S. Congress, 328 F.3d 466, 487 (9th Cir. 2002) ("Newdow III"), rev'd on other

23

grounds, 542 U.S. 1 (2004), flowed from the erroneous premise that the Pledge is a "religious act" because it contains "the statement that the United States is a nation 'under God.'"  But students pledge allegiance "to the Flag" and "to the Republic for which it stands."  The Pledge's reference to God is descriptive — an acknowledgment of our Nation's religious heritage, not a profession of religious belief — and it does not change the Pledge's fundamentally patriotic nature.  Moreover, the Ninth Circuit's expansive application of Lee compounded this initial misstep.  Lee was confined to "overt religious exercise[s]" in which a "student had no real alternative which would have allowed her to avoid the fact or appearance of participation."  Id. at 588.  Here, that "real alternative" plainly exists: any student can "avoid the fact or appearance of participation" by simply opting out of Pledge recitation, a right that Barnette has protected for nearly 65 years.

Finally, Plaintiffs' suggestion that it is somehow unprincipled to rely on the Supreme Court's specific statements regarding the constitutionality of the Pledge is misguided.  As the Justices have explained, "different categories of Establishment Clause cases . . . may call for different approaches," Grumet, 512 U.S. at 720 (O'Connor, J., concurring), and "no single mechanical formula . . . can accurately draw the constitutional line in every case," Van Orden, 545 U.S. at 699 (Breyer, J., concurring in the judgment).  See also id. at 702-03 (Breyer, J., concurring in the judgment) (passage of 40 years without legal challenge "suggest[s] more strongly than can any set of formulaic tests that few individuals . . . are likely to have understood the [Ten Commandments] monument as . . . a government effort . . . primarily to promote religion over nonreligion").

For these reasons, Plaintiffs' position that this case is controlled by dozens of off-point and out-of-context Supreme Court dicta, rather than by the Court's specific approval of the Pledge in Lynch, County of Allegheny, and Elk Grove, is wholly without merit.  Those cases firmly demonstrate that the Supreme Court has "made clear that the Establishment Clause, regardless of

the test to be used, does not extend so far as to make unconstitutional the daily recitation of the Pledge in public school." Myers, 418 F.3d at 405. "If the Justices are just pulling our leg, let them say so." Sherman, 980 F.2d at 448.

## CONCLUSION

For all the foregoing reasons, in addition to those set forth in our opening brief, the Federal Defendants' motion to dismiss should be granted.

Dated: March 11, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

THOMAS P. COLANTUONO
United States Attorney

CARL J. NICHOLS
Deputy Assistant Attorney General

THEODORE C. HIRT
Assistant Director, Federal Programs Branch

 /s/ Eric B. Beckenhauer
ERIC B. BECKENHAUER, Cal. Bar No. 237526
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Telephone: (202) 514-3338
Facsimile: (202) 616-8470
E-mail: eric.beckenhauer@usdoj.gov

Counsel for the United States of America and the
United States Congress

**<u>CERTIFICATE OF SERVICE</u>**

  I hereby certify that on March 11, 2008, the foregoing document was filed with the Clerk of Court via the CM/ECF system, causing it to be served on Michael A. Newdow and Rosanna T. Fox, counsel for the Plaintiffs; David H. Bradley, counsel for the School District Defendants; Nancy Smith, counsel for intervenor-defendant the State of New Hampshire; and Eric C. Rassbach, Kevin J. Hasson, and Bradford T. Atwood, counsel for intervenor-defendants Muriel Cyrus, et al.


      /s/ *Eric B. Beckenhauer*
     ERIC B. BECKENHAUER
     Trial Attorney
     U.S. Department of Justice