UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

The Freedom from Religion Foundation;
Jan Doe and Pat Doe, Parents;
DoeChild-1, DoeChild-2, and DoeChild-3,
Minor Children,
     Plaintiffs

                                   Civil No. 07-cv-356-SM
     v.                           Opinion No. 2009 DNH 142

The Hanover School District and
The Dresden School District,
     Defendants

The United States of America,
     Intervenor

The State of New Hampshire,
     Intervenor

Anna Chobanian, John Chobanian,
Kathryn Chobanian, Schuyler Cyrus,
Elijah Cyrus, Rhys Cyrus, Austin
Cyrus, Daniel Phan, Muriel Cyrus,
Michael Chobanian, Margarethe Chobanian,
Minh Phan, Suzu Phan, and the Knights of
Columbus,
     Intervenors

**O R D E R**

The parties remaining as defendants in this case are the
Hanover School District and the Dresden School District.  All
other individuals and institutions named in the caption of this
order are intervenors and, as such, have the right to be heard on
only two issues: the constitutionality of 4 U.S.C. § 4 (sometimes
referred to below as "the federal Pledge statute"), and the
constitutionality of N.H. REV. STAT. ANN. ("RSA") § 194:15-c

(sometimes referred to below as "the New Hampshire Pledge statute").

## Background

The school districts moved to dismiss the claims against them "for the reasons set forth in the Federal Government's Memorandum in Support of the Federal Defendants' Motion to Dismiss . . . as to the constitutionality of 4 U.S.C. § 4 and the State of New Hampshire's Memorandum of Law in Support of Motion to dismiss . . . as to the constitutionality of RSA 194:15-c." (Mot. to Dismiss (document no. 46), at 1-2.) Thereafter, plaintiffs filed their first amended complaint (document no. 52). The following facts are drawn from that complaint.

Jan Doe and Pat Doe ("the Doe parents") are the mother and father of DoeChild-1, DoeChild-2, and DoeChild-3 ("the Doe children"). At the time the complaint was filed, the eldest Doe child attended a middle school jointly administered by the Hanover and Dresden school districts. The two younger Doe children were enrolled in a public elementary school operated by the Hanover district.

Jan and Pat Doe describe themselves as atheist and agnostic, respectively. Both are members of the Freedom from Religion Foundation. Each of the Doe children is said to be either an

2

atheist or an agnostic, and each is said to either deny or doubt the existence of God.

The Pledge of Allegiance ("Pledge") is routinely recited in the Doe childrens' classrooms, under the leadership of their teachers.  As provided by Congress, the Pledge reads:

> I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.

4 U.S.C. § 4.  While the statute prescribes the text of the Pledge, and describes the preferred formalities attendant to its recitation, the statute includes no other mandate.  That is, the statute does not compel recitation of the Pledge under any circumstances or by any person.

In New Hampshire, recitation of the Pledge in schools is governed by state law, which provides:

> I.  As a continuation of the policy of teaching our country's history to the elementary and secondary pupils of this state, this section shall be known as the New Hampshire School Patriot Act.
>
> II.  A school district shall authorize a period of time during the school day for the recitation of the pledge of allegiance.  Pupil participation in the recitation of the pledge of allegiance shall be voluntary.
>
> III.  Pupils not participating in the recitation of the pledge of allegiance may silently stand or

remain seated but shall be required to respect the
rights of those pupils electing to participate.  If
this paragraph shall be declared to be unconstitutional
or otherwise invalid, the remaining paragraphs in this
section shall not be affected, and shall continue in
full force and effect.

RSA 194:15-c.


Plaintiffs stipulate that no Doe child has been compelled to

recite the Pledge or its included phrase, "under God."

(Plaintiffs do assert, however, that while the Doe children have

not been compelled to recite the Pledge, they have been

coerced.[1])  The Doe parents asked the principals of their

childrens' schools to provide assurances that the Pledge would

not be recited in their childrens' classes, but have received no

such assurance.


Plaintiffs claim that by leading the Doe childrens' classes

in reciting the Pledge of Allegiance in the manner prescribed by

RSA 194:15-c, defendants have violated the rights of the Doe

children under the Establishment Clause (Count I) and the Free

Exercise Clause (Count II) of the United States Constitution; the

---

[1] The distinction between compulsion and coercion drawn by
plaintiffs is based on Chief Justice Rehnquist's concurrence in
Elk Grove Unified School District v. Newdow, 542 U.S. 1, 31 n.4
(2004) (Rehnquist, J., concurring) ("I think there is a clear
difference between compulsion (Barnette) and coercion (Lee).")
(citing W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624 (1943), as
an example of compulsion, and Lee v. Weisman, 505 U.S. 577
(1992), as an example of coercion).

rights of the Doe parents under the federal Free Exercise Clause (Count III); the rights of both the Doe children and their parents under the Due Process and Equal Protection Clauses of the United States Constitution (Count IV); and the Doe parents' federal constitutional rights of parenthood, as well as the Doe children's concomitant rights (Count V). Plaintiffs also assert that defendants have violated the rights of the Doe children and parents under Part I, Article 6, of the New Hampshire Constitution (Count VI); the Doe childrens' rights to the free exercise of religion, established by RSA 169-D:23 (Count VII); and the Doe parents' state rights of parenthood, as well as the associated rights of the Doe children (Count VIII). Finally, in Count IX, plaintiffs assert that "the use of a Pledge of Allegiance containing the words 'under God' is void as against public policy." (First Am. Compl. ¶ 84.)

Plaintiffs ask the court to: (1) declare that, by having teachers lead students in reciting the Pledge of Allegiance, defendants have violated the various constitutional and statutory provisions identified above; (2) declare that RSA 194:15-c is void as against public policy; and (3) enjoin recitation of the Pledge of Allegiance in the public schools within defendants' jurisdictions.

As noted, the school districts filed a motion to dismiss plaintiffs' original complaint. Then, after plaintiffs filed their first amended complaint, the State of New Hampshire filed a supplemental memorandum supporting its earlier motion to dismiss, in which it addressed claims that were newly raised in plaintiffs' first amended complaint. The United States and the remaining intervenors filed renewed motions to dismiss in which they incorporated by reference arguments made in earlier dismissal motions, and added arguments to address claims raised for the first time in the first amended complaint. The school districts have not directly responded to the first amended complaint other than by assenting to its filing, but the parties all seem to be proceeding on the assumption that the school districts persist in their original motion to dismiss, as reiterated and embellished by the intervenors with respect to the amended complaint. The court will likewise construe the pending motions to dismiss as having been advanced by the school districts as well.

The United States says plaintiffs' claims amount to an "as applied" challenge to the federal Pledge statute, but that characterization seems inapt. The statute prescribes the content of the Pledge of Allegiance, but does not command any person to recite it, or to lead others in its recitation. Merely leading students in reciting the Pledge does not seem an "application" of

6

the federal Pledge statute to the Doe children.  Teachers leading
students in a Pledge recital are actually complying with New
Hampshire's Pledge statute.  Accordingly, the constitutionality
of 4 U.S.C. § 4 "as applied" is not at issue.

The State of New Hampshire stands on a different footing.
Plaintiffs argue that the school districts violated their
constitutional rights by leading the Pledge in classes in which
the Doe children are enrolled.  Because all appear to agree, as a
factual matter, that the Doe children's teachers acted in
compliance with the mandate of RSA 194:15-c, determining the
constitutionality of the teachers' actions turns on the
constitutionality of RSA 194:15-c.  That is precisely the
question the State of New Hampshire is entitled to address.

## The Legal Standard

A motion to dismiss for "failure to state a claim upon which
relief can be granted," FED. R. CIV. P. 12(b)(6), requires the
court to conduct a limited inquiry, focusing not on "whether a
plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims."  Scheuer v.
Rhodes, 416 U.S. 232, 236 (1974).  "The motion [should] be
granted unless the facts, evaluated in [a] plaintiff-friendly
manner, contain enough meat to support a reasonable expectation
that an actionable claim may exist."  Andrew Robinson Int'l, Inc.

v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008)

(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); Morales–

Tañón v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008)).


## Discussion

Count I

In Count I, plaintiffs claim that defendants violated the

rights of the Doe children under the federal Establishment Clause

by leading their classes in reciting the Pledge of Allegiance.

Defendants move to dismiss, arguing principally that: (1) the

Establishment Clause permits official acknowledgments of the

nation's religious heritage and character; (2) the Pledge of

Allegiance is a permissible acknowledgment of the nation's

religious heritage and character; and (3) the purpose of the New

Hampshire Pledge statute is to promote patriotism and respect for

the flag.[2]  Plaintiffs disagree, categorically.


The Establishment Clause provides that "Congress shall make

no law respecting an establishment of religion."  U.S. CONST.

amend. I.  "The [Establishment] Clause[ ] appl[ies] to the States

by incorporation into the Fourteenth Amendment."  Elk Grove

Unified Sch. Dist. v. Newdow, 542 U.S. 1, 8 n.4 (2004) (citing

---

[2] As subsidiary matters, defendants further argue that the
Pledge must be considered as a whole, and that Lee, 505 U.S. 577,
is not controlling in this case because reciting the Pledge does
not constitute an inherently religious practice.

Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)); see also
Parker v. Hurley, 514 F.3d 87, 103 (1st Cir. 2008) (citation
omitted).

Plaintiffs are distressed, primarily, that the phrase "under
God" is included in the Pledge's text.  They contend that
inclusion of "under God" in the Pledge renders the New Hampshire
Pledge statute unconstitutional under six different legal tests
that have been employed in assessing Establishment Clause claims:
(1) the "touchstone test" of neutrality found in McCreary County
v. ACLU of Kentucky, 545 U.S. 844, 860 (2005); (2) the
"endorsement test" posited by Justice O'Conner in Lynch v.
Donnelly, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring);
(3) the first two prongs of the familiar Lemon test, see Lemon v.
Kurtzman, 403 U.S. 602, 612-13 (1971); (4) the "outsider test"
described in Santa Fe Independent School District v. Doe, 530
U.S. 290, 309 (2000); (5) the "imprimatur test" articulated by
Justice Blackmun in Lee v. Weisman, 505 U.S. 577, 606 (1992)
(Blackmun, J., concurring); and (6) the "coercion test" noted in
Engel v. Vitale, 370 U.S. 421 (1962), and refined in Lee, 505
U.S. at 593.

The three federal appellate opinions addressing the
constitutionality of public-school Pledge recitation all take
slightly different analytical approaches.  See Myers v. Loudoun

County Pub. Schs., 418 F.3d 395, 402 (4th Cir. 2005) (upholding
the Virginia Pledge statute against an Establishment Clause
challenge based upon "[t]he history of our nation" and "repeated
dicta from the [Supreme] Court respecting the constitutionality
of the Pledge"); Newdow v. U.S. Cong., 328 F.3d 466, 487 (9th
Cir. 2003) (striking down school district's Pledge policy on
Establishment Clause grounds based upon the coercion test found
in Lee, 505 U.S. 577); Sherman v. Cmty. Consol. Sch. Dist. 21,
980 F.2d 437, 445 (7th Cir. 1992) (upholding the Illinois Pledge
statute by taking a "more direct" approach than the trial court,
which "trudged through the three elements identified by the Court
in Lemon [v. Kurtzman, 403 U.S. 602 (1971)]").  The Sherman
court's own "more direct" approach achieved directness by
starting from the premise that the words "under God" in the
Pledge constitute a "ceremonial reference[ ] in civic life to a
deity" of a sort that the nation's founders would not have
considered the establishment of religion.  Id. at 445.


    A.  Applying the Lemon Test

    The Lemon test has its share of detractors.  See, e.g.,
Sherman, 980 F.2d 445.  Nevertheless, within the last decade, in
a case involving an Establishment Clause challenge to a state law
limiting local regulation of land use for religious purposes with
respect to land owned by a religious denomination, the court of
appeals for this circuit endorsed continued application of the

10

Lemon test ("[a]s a practical framework for analysis in cases
such as this, the Supreme Court has adopted the three-part test
articulated in Lemon v. Kurtzman").  Boyajian v. Gatzunis, 212
F.3d 1, 4 (1st Cir. 2000) (citing Lemon, 403 U.S. at 612-13).  It
is appropriate, then, to begin by applying the Lemon test.

        The United States Supreme Court recently described the Lemon
test:

> Lemon stated a three-part test: "First, the
> statute must have a secular legislative purpose;
> second, its principal or primary effect must be one
> that neither advances nor inhibits religion; finally,
> the statute must not foster an excessive government
> entanglement with religion."

Cutter v. Wilkinson, 544 U.S. 709, 718 n.6 (2005) (quoting Lemon,
403 U.S. at 612-13); see also Boyajian, 212 F.3d at 4 ("a law
does not violate the Establishment Clause if (1) it has a secular
legislative purpose, (2) its principal or primary effect neither
advances nor inhibits religion, and (3) the statute does not
foster excessive government entanglement with religion") (citing
Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day
Saints v. Amos, 483 U.S. 327, 335-39 (1987); Rojas v. Fitch, 127
F.3d 184, 187 (1st Cir. 1997)).

1. Purpose

The "first step in evaluating [the New Hampshire Pledge statute's] constitutionality is to ascertain whether it serves a 'secular legislative purpose.' " Boyajian, 212 F.3d at 5 (citation omitted). "The touchstone for [an] analysis [of legislative purpose] is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.' " McCreary County, 545 U.S. at 860 (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968)) (other citations omitted). Accordingly, "[w]hen the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." McCreary County, 545 U.S. at 860 (citations omitted) (emphasis added). "Manifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the 'understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens . . . .' " Id. (quoting Zelman v. Simmons-Harris, 536 U.S. 639, 718 (2002) (Breyer, J., dissenting)). "By showing a purpose to favor religion, the government 'sends the . . . message to . . . nonadherents "that they are outsiders, not full members of the political community, and an accompanying message to adherents

12

that they are insiders, favored members . . . ." ' " <u>McCreary</u> <u>County</u>, 545 U.S. at 860 (quoting <u>Santa Fe Indep. Sch. Dist.</u>, 530 U.S. at 309-310).

Defendants argue that the New Hampshire Pledge statute serves the secular legislative purposes of fostering an appreciation of history, and promoting patriotism and respect for the American flag.  Plaintiffs counter by focusing on the legislative purpose of the act of Congress that inserted the phrase "under God" into the Pledge in 1954.  Plaintiffs see this case as a direct challenge to the constitutionality of including "under God" in the Pledge statute, while defendants see the case as one primarily challenging a patriotic civic custom, in which the Pledge must be considered as a whole.

Defendants rely on <u>Lynch v. Donnelly</u>, 465 U.S. 668, 685 (1984), for the proposition that when conducting an Establishment Clause analysis, the focus must be not on religious symbols alone, but on their overall setting, echoing the court of appeals' observation that "the context of a religious display is crucial in determining its constitutionality." <u>Knights of</u> <u>Columbus v. Town of Lexington</u>, 272 F.3d 25, 33 (1st Cir. 2001) (<u>comparing</u> <u>County of Allegheny v. ACLU</u>, 492 U.S. 573, 621 (1989) <u>with</u> <u>Lynch</u>, 465 U.S. at 685).  That principle, reasonably extended to the facts of this case, emphasizes that the context

in which religious words or symbols are employed is critical to any Establishment Clause analysis.  Here, the context in which the disputed words appear is provided by the thirty-one words that make up the Pledge.

The New Hampshire Pledge statute plainly has a secular legislative purpose.  Here, "an understanding of official objective emerges from readily discoverable fact, without [need of] any judicial psychoanalysis of a drafter's heart of hearts." McCreary County, 545 U.S. at 862 (citation omitted).  The New Hampshire Pledge statute is titled "New Hampshire School Patriot Act."  RSA 194:15-c.  The statute's own words describe its purpose as continuing "the policy of teaching our country's history to the elementary and secondary pupils of this state." RSA 194:15-c, I.  That is a secular purpose.

Moreover, the legislative history contains a far-reaching discussion of patriotism, see N.H.S. Jour. 945-67 (2002), and places enactment of the statute in the context of a response to the attacks of September 11, 2001, see id. at 948, 953.  That context supports the conclusion that patriotism, rather than support of theism over atheism or agnosticism, was the guiding force behind the enactment of the New Hampshire Pledge statute.

14

With regard to the phrase "under God" in the Pledge, Senator O'Hearn stated, on the floor of the New Hampshire Senate:

> Justice Brennan of the Supreme Court wrote, "we have simply interwoven the motto 'In God we Trust' so deeply into the fabric of our civil polity that its present use may well not present that type of involvement [with religion] which the first amendment prohibits. . .  The reference to divinity in the revised Pledge of Allegiance for example, may merely recognize the historical fact that our nation was believed to have been founded under God.  Thus, reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln's Gettysburg address which contains an allusion to the same historical fact."

N.H.S. JOUR. 958, supra (quoting Sch. Dist. v. Schempp, 374 U.S. 203, 303-04 (1963) (Brennan, J., concurring)).  Senator Wheeler added: "We are not touching the words in the Pledge of Allegiance.  It still says 'one nation under God'.  That has not been removed.  We are not expressing anything at the state level about God, one way or the other, so just forget about that."  N.H.S. JOUR. 958, supra.  Like the legislative discussions of patriotism, the legislators' disclaimers of religious motivation buttress the conclusion that the New Hampshire Pledge statute was enacted for patriotic, not religious, purposes.

Finally, the legislative history supports defendants' position in another way.  Before the New Hampshire School Patriot Act (i.e., the New Hampshire Pledge statute) was enacted in 2002, RSA chapter 194 included a section titled "Lord's Prayer and

15

Pledge of Allegiance in Public Elementary Schools," RSA 194:15-a
(1989), which provided that "a school district may authorize the
recitation of the traditional Lord's prayer and the pledge of
allegiance to the flag in public elementary schools," id.  The
New Hampshire School Patriot Act separated the Pledge of
Allegiance from the Lord's prayer, leaving the prayer provision
in RSA 195:14-a and creating a new section for the Pledge.
Leaving aside the potential constitutional infirmities of the
Lord's prayer statute, which were in fact discussed by the
legislature when it enacted the new separate Pledge statute, see
N.H.S. Jour. 956-61, supra, the placement of the Pledge in a
separate provision, apart from the Lord's prayer provision,
certainly underscores the secular purpose of the New Hampshire
Pledge statute.

    2. Effect

    "The second basic Establishment Clause concern is that of
avoiding the effective promotion or advancement of particular
religions or of religion in general by the government."  Rojas,
127 F.3d at 189, abrogated on other grounds by Steel Co. v.
Citizens for a Better Env't, 523 U.S. 83 (1998).  Under the Lemon
effects test, "[i]t is beyond dispute that . . . government may
not coerce anyone to support or participate in religion or its
exercise, or otherwise act in a way which 'establishes a [state]
religion or religious faith, or tends to do so.' "  Lee, 505 U.S.

at 587 (quoting <u>Lynch</u>, 465 U.S. at 678) (other citations
omitted).  Moreover, "there are heightened concerns with
protecting freedom of conscience from subtle coercive pressure in
the elementary and secondary public schools," <u>Lee</u>, 505 U.S. at
592 (citations omitted), and "prayer exercises in public schools
carry a particular risk of indirect coercion."  <u>Id.</u>

     The New Hampshire Pledge statute, as implemented by the
school districts, does not have the effect of coercing the Doe
children to support or participate in religion or its exercise.
First, the sort of coercion at issue in <u>Lee</u> is not present in
this case.  The Supreme Court described the coercion in <u>Lee</u> this
way:

> The undeniable fact is that the school district's
> supervision and control of a high school graduation
> ceremony places public pressure, as well as peer
> pressure, on attending students to stand as a group or,
> at least, maintain respectful silence during the
> invocation and benediction.  This pressure, though
> subtle and indirect, can be as real as any overt
> compulsion.  Of course, in our culture standing or
> remaining silent can signify adherence to a view or
> simple respect for the views of others.  And no doubt
> some persons who have no desire to join a prayer have
> little objection to standing as a sign of respect for
> those who do.  But for the dissenter of high school
> age, who has a reasonable perception that she is being
> forced by the State to pray in a manner her conscience
> will not allow, the injury is no less real.  There can
> be no doubt that for many, if not most, of the students
> at the graduation, the act of standing or remaining
> silent was an expression of participation in the
> rabbi's prayer.  <u>That was the very point of the
> religious exercise</u>.  It is of little comfort to a
> dissenter, then, to be told that for her the act of

standing or remaining in silence signifies mere
respect, rather than participation.  What matters is
that, given our social conventions, a reasonable
dissenter in this milieu could believe that the group
exercise signified her own participation or approval of
it.

Finding no violation under these circumstances
would place objectors in the dilemma of participating,
with all that implies, or protesting.  We do not
address whether that choice is acceptable if the
affected citizens are mature adults, but we think the
State may not, consistent with the Establishment
Clause, place primary and secondary school children in
this position.

Id. at 593 (emphasis supplied).


Here, by contrast, objectors are not placed in a religious

dilemma.  The dilemma in Lee was that a student who objected to

prayer was confronted, while seated at her graduation ceremony,

with a prayer (a religious exercise) delivered by a rabbi.  She,

and all the other attendees were effectively rendered involuntary

congregants, being led in prayer by a religious officiant.  The

student's choices were these: involuntary participation, silent

acquiescence that bore all the hallmarks of participation, or

active protest.  And, the onus was placed on her to determine how

to deal with her objection to the religious exercise being

imposed.  The New Hampshire Pledge statute sets up no such

dilemma.

The statute directs schools to authorize a "period of time during the school day for the recitation of the pledge of allegiance" but provides that "[p]upil participation <u>shall be</u> voluntary."  RSA 194:15-c, II.  Thus, rather than leaving students to conclude that participation is required and that non-participation is, necessarily, an "objection," <u>Lee</u>, 505 U.S. at 590, a "dissent," <u>id.</u> at 592, 593, or a "protest," <u>id.</u> at 593, the New Hampshire Pledge statute expressly endorses non-participation.  That recognition somewhat distinguishes voluntary participation in the Pledge recital from the claim of voluntary participation in graduation ceremonies that the Court found unpersuasive in <u>Lee</u>, 505 U.S. at 594-95.  And, as noted in <u>Lee</u>, to avoid being made an unwilling congregant, a student would have had to forego "one of life's most significant occasions."  <u>Id.</u> at 595.  Here, the Doe children forfeit no significant experience or occasion to avoid reciting the Pledge, or that portion of it to which they object.  While I recognize that peer or social pressure probably does push students toward participation, by sheer dint of the number of students opting in rather than out, opting out of a Pledge recitation involves little more than exercising the right to demur.

But statutorily prescribed voluntariness is not the main point.  The critical and dispositive difference is this:  the Pledge of Allegiance is not a religious prayer, nor is it a

19

"nonsectarian prayer" of the sort at issue in <u>Lee</u>, 505 U.S. at 589, and its recitation in schools does not constitute a "religious exercise."  The Pledge does not thank God.  It does not ask God for a blessing, or for guidance.  It does not address God in any way.  <u>See</u> <u>Myers</u>, 418 F.3d at 407–08 (describing prayer as an "approach to Divinity in word or thought" or a "communication between an individual and his deity").  Rather, the Pledge, in content and function, is a civic patriotic statement — an affirmation of adherence to the principles for which the Nation stands.[3]  Inclusion of the words "under God," in context, does not convert the Pledge into a prayer or religious exercise, as discussed in greater detail later.  Peer or social pressure to participate in a school exercise not of a religious character does not implicate the Establishment Clause, and as a civic or patriotic exercise, the statute is clear in making participation completely voluntary.

Because the New Hampshire Pledge statute does not coerce students to support or participate in a religious exercise, it does not run afoul of the second prong of the <u>Lemon</u> test.

---

[3] <u>In Elk Grove</u>, the Supreme Court described recitation of the Pledge as "a patriotic exercise designed to foster national unity and pride" in the "ideals that our flag symbolizes," specifically, the "proud traditions 'of freedom, of equal opportunity, of religious tolerance, and of good will for other peoples who share our aspirations.' "  542 U.S. at 6 (quoting <u>Texas v. Johnson</u>, 491 U.S. 397, 437 (1989) (Stevens, J., dissenting)).

### 3. Entanglement

The third prong of the <u>Lemon</u> test requires that a statute not foster excessive government entanglement with religion.[4] Plaintiffs do not argue that the New Hampshire Pledge statute encourages government entanglement with religion. Accordingly, defendants prevail on the third prong of the <u>Lemon</u> test.

### 4. Lemon Summary

The New Hampshire Pledge statute has a secular legislative purpose. It was enacted to enhance instruction in the Nation's history, and foster a sense of patriotism. Its primary effect neither advances nor inhibits religion. It does not foster excessive government involvement with religion. In other words, RSA 194:15-c satisfies all three prongs of the <u>Lemon</u> test. Accordingly, defendants are entitled to dismissal of Count I.

---

[4] While <u>Lee</u> was decided on the second prong of the <u>Lemon</u> test, the facts of that case provide a textbook example of impermissible government entanglement with religion. "A school official, the principal, decided that an invocation and a benediction should be given." <u>Lee</u>, 505 U.S. at 587. That same official selected the clergyman who led the prayers. <u>Id.</u> Beyond that, "the principal directed and controlled the content of the prayers." <u>Id.</u> at 588. A government official who chooses to include a prayer in a student activity, who selects the clergyman who delivers it, and who controls the content of the prayer entangles government and religion to a substantial degree.

B.  Applying the Approach of the Fourth and Seventh Circuits

As noted, plaintiffs direct their challenge not at the Pledge as a whole, but at the two words, "under God," added in 1954.  While application of the Lemon test is determinative of the Establishment Clause issue raised in Count I, the court turns, briefly, to different approaches taken by the Fourth and Seventh Circuits in characterizing the effect of the words "under God" in the Pledge.

In Myers, the court concluded that the Pledge does not constitute a prayer, reasoning as follows:

> Undoubtedly, the Pledge contains a religious phrase, and it is demeaning to persons of any faith to assert that the words "under God" contain no religious significance.  See Van Orden [v. Perry], [545 U.S. 677, 695] (2005) (Thomas, J., concurring) ("words such as 'God' have religious significance").  The inclusion of those two words, however, does not alter the nature of the Pledge as a patriotic activity.  The Pledge is a statement of loyalty to the flag of the United States and the Republic for which it stands; it is performed while standing at attention, facing the flag, with right hand held over heart.  See also West Virginia v. Barnette, 319 U.S. 624, 641 (1943) (referring to the Pledge as a "patriotic ceremony").  A prayer, by contrast, is "a solemn and humble approach to Divinity in word or thought."  Webster's Third New Int'l Dictionary 1782 (1986).  It is a personal communication between an individual and his deity, "with bowed head, on bended knee."  Newdow, 328 F.3d at 478 (O'Scannlain, J., dissenting from denial of rehearing en banc).

418 F.3d at 407-08 (parallel citations omitted).  That reasoning is persuasive.

22

In <u>Sherman</u>, Judge Easterbrook posed the rhetorical question: "Does 'under God' make the Pledge a prayer, whose recitation violates the establishment clause of the first amendment?" <u>Sherman</u>, 980 F.2d at 445. His response began with a description of the phrase "under God" as a "ceremonial reference[ ] in civic life to a deity." <u>Id.</u> He continued by describing the history of such ceremonial references in significant historical documents,[5] noting that "[w]hen it decided <u>Engel v. Vitale</u>, [370 U.S. 421 (1962),] the first of the school-prayer cases, the [Supreme] Court recognized this tradition and distinguished ceremonial references to God from supplications for divine assistance." <u>Id.</u> at 446. Judge Easterbrook went on to invoke Justice Brennan's conclusion "that 'the reference to God contained in the Pledge of Allegiance to the flag can best be understood, in Dean Rostow's apt phrase, as a form of ceremonial deism protected from Establishment Clause scrutiny chiefly because it has lost through rote repetition any significant religious content.' " <u>Id.</u> at 447 (quoting <u>Lynch</u>, 465 U.S. at 716 (Brennan, J., dissenting)) (internal quotation marks and brackets omitted).

---

[5] The <u>Sherman</u> opinion cites, among others, the Declaration of Independence, the declarations in support of separation between church and state by James Madison and Thomas Jefferson, and Abraham Lincoln's Gettysburg Address and second inaugural address. <u>Sherman</u>, 980 F.2d at 446. Of Lincoln's second inaugural address, the court said: "Pupils who study this address with care will find 14 references to God among its 699 words." <u>Id.</u>

While the Fourth Circuit did not go so far as to adopt the Seventh Circuit's "ceremonial deism" view, both courts have persuasively concluded that the phrase "under God" does not transform the Pledge into a prayer, or its recitation into a religious exercise.

Of course, the Fourth and Seventh Circuits are not the only federal appellate courts to have addressed the issue. In <u>Newdow v. United States Congress</u>, the Ninth Circuit reached a different conclusion, deciding that, "[i]n the context of the Pledge, the statement that the United States is a nation 'under God' is a profession of a religious belief, namely a belief in monotheism," <u>Newdow</u>, 328 F.3d at 487, and recitation of the Pledge in a classroom, even with the opt-out required by <u>Barnette</u>, "places students in the untenable position of choosing between participating in an exercise with religious content or protesting," <u>id.</u> at 488.

I am of the view that the Fourth and Seventh Circuits got it right.  The words "under God" undeniably come from the vocabulary of religion, or, at the least, reflect a theistic orientation, but no more so than the benign deism reflected in the national trust in God declared on our currency, or in ceremonial intercessions to "save this Honorable Court" at the commencement of many court proceedings.  It may well be that some, perhaps

24

many, people required to employ U.S. currency, or socially pressured to stand during civic ceremonies, feel offended by what seems to them an imposition of theistic doctrine.  But the Constitution prohibits the government from establishing a religion, or coercing one to support or participate in religion, a religious exercise, or prayer.  It does not mandate that government refrain from all civic, cultural, and historic references to a God.  The line is often difficult to draw, of course, and in some senses the drawn line yet has some mobility.

When Congress added the words "under God," to the Pledge in 1954, its actual intent probably had far more to do with politics than religion — more to do with currying favor with the electorate than with an Almighty.  (God, if God exists, is probably not so easily fooled.)  In the intervening half century since the words were added, rote repetition has, as Justice Brennan observed, removed any significant religious content embodied in the words, if there ever was significant religious (as opposed to political) content embodied in those words. Today, the words remain religious words, but plainly fall comfortably within the category of historic artifacts — reflecting a benign or ceremonial civic deism that presents no threat to the fundamental values protected by the Establishment Clause.

Counts II and III

In Counts II and III, plaintiffs claim that defendants violated the rights of the Doe children and their parents under the Free Exercise Clause of the federal Constitution by leading the Doe children's classes in reciting the Pledge of Allegiance. Defendants argue that they are entitled to dismissal of plaintiffs' free-exercise claims because plaintiffs do not allege that the Doe Children have been subject to compulsion of any sort.  Plaintiffs disagree, but do not develop an argument.

The First Amendment to the United States Constitution bars Congress from making any law prohibiting the free exercise of religion.  U.S. CONST. amend. I.  That bar applies to the states. See Elk Grove, 542 U.S. at 8 n.4; Parker, 514 F.3d at 103.  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." Employment Div. v. Smith, 494 U.S. 872, 877 (1990)).  Under the Free Exercise Clause,

> the government may not, for example, (1) compel affirmation of religious beliefs; (2) punish the expression of religious doctrines it believes to be false; (3) impose special disabilities on the basis of religious views or religious status; or (4) lend its power to one side or the other in controversies over religious authorities or dogma.

Parker, 514 F.3d at 103 (citing Smith, 494 U.S. at 877).

26

The free-exercise claim appears to be that exposure to classroom recitation of the Pledge places an unconstitutional burden on a student's ability to freely believe or practice atheism or agnosticism (or polytheism).  That claim fails for two reasons.

To begin, as explained above, the Pledge, taken as a whole, is a civic patriotic affirmation, not a religious exercise, and inclusion of the words "under God" constitutes, at the most, a form of ceremonial or benign deism.  The benign nature of the words, in context, preclude a finding that listening to others recite the Pledge "compels affirmation of religious beliefs," or "lends [government] power to one side or the other in controversies over religious . . . dogma."  Second, as the court of appeals explained in a case involving a substantially analogous free-exercise objection to curricular materials:

> Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement that the student agree with or affirm those ideas, or even participate in discussions about them.  See Fleischfresser [v. Directors of Sch. Dist. 200], 15 F.3d [680,] 690 [(7th Cir. 1994)]; Mozert [v. Hawkins County Bd. of Educ.], 827 F.2d 1058,] 1063-65, 1070 [(6th Cir. 1987)]; see also Bauchman [ex rel. Bauchman v. West High Sch.], 132 F.3d [542,] 558 [(10th Cir. 1997)] ("[P]ublic schools are not required to delete from the curriculum all materials that may offend any religious sensibility." (quoting Florey v. Sioux Falls Sch. Dist. 49-5, 619 F.2d 1311, 1318 (8th Cir. 1980)) (internal quotation marks omitted)).  The reading of King and King [the

book to which the school children in <u>Parker</u> objected on
religious grounds] was not instruction in religion or
religious beliefs.  <u>Cf.</u> <u>Barnette</u>, 319 U.S. at 631
(distinguishing between compelling students to declare
a belief through <u>mandatory</u> <u>recital</u> of the pledge of
allegiance, which violates free exercise, and "merely
. . . acquaint[ing students] with the flag salute so
that they may be informed as to what it is or even what
it means").

<u>Parker</u>, 514 F.3d at 106 (footnote, parallel citation omitted)
(emphasis added).  Here, as in <u>Parker</u>, the objection is to mere
exposure; there are no allegations of required affirmation or
participation.  And so, like the students in <u>Parker</u>, the Doe
children have failed to state a claim under the Free Exercise
Clause.

        <u>Parker</u> is also dispositive of the Doe parents' free-exercise
claim.  In <u>Parker</u>, the court of appeals cited with approval the
Sixth Circuit's determination that "exposure to ideas through the
required reading of books did not constitute a constitutionally
significant burden on the plaintiffs' free exercise of religion."
<u>Parker</u>, 514 F.3d at 105 (citing <u>Mozert</u>, 827 F.2d at 1065).  The
<u>Parker</u> court continued:

        [T]he [<u>Mozert</u>] court emphasized that "the evil
        prohibited by the Free Exercise Clause" is
        "governmental compulsion either to do or refrain from
        doing an act forbidden or required by one's religion,
        or to affirm or disavow a belief forbidden or required
        by one's religion," and reading or even discussing the
        books did not compel such action or affirmation.

Parker, 514 F.3d at 105 (quoting Mozert, 827 F.2d at 1066, 1069).
Here, the court has determined that the Doe children have not
been compelled to perform or to refrain from performing any act,
and they have not been compelled to affirm or disavow any belief.
Thus, the rights of their parents under the Free Exercise Clause
have not been violated.  As the court of appeals explained in
Parker:

> the mere fact that a child is exposed on occasion in
> public school to a concept offensive to a parent's
> religious belief does not inhibit the parent from
> instructing the child differently.  A parent whose
> "child is exposed to sensitive topics or information
> [at school] remains free to discuss these matters and
> to place them in the family's moral or religious
> context, or to supplement the information with more
> appropriate materials." C.N. [v. Ridgewood Bd. of
> Educ.], 430 F.3d [159,] 185 [(3d Cir. 2005)]; see also
> Newdow, 542 U.S. at 16 (noting that the school's
> requirement that Newdow's daughter recite the pledge of
> allegiance every day did not "impair[ ] Newdow's right
> to instruct his daughter in his religious views").

Parker, 514 F.3d at 105-06 (parallel citations omitted).  Like
the parents in Parker, the Doe parents have suffered no
impairment in their ability to instruct their children in their
views on religion.  Accordingly, they have failed to state a
claim under the Free Exercise Clause.


Because neither the Doe children nor the Doe parents have
stated a claim under the Free Exercise Clause, defendants are
entitled to dismissal of Counts II and III.

Count IV

In Count IV, plaintiffs claim that defendants violated their rights under the Due Process[6] and Equal Protection Clauses of the United States Constitution by leading the Doe children's classes in reciting the Pledge. More specifically, they assert that defendants: (1) have a duty to show equal respect to their beliefs, i.e., atheism or agnosticism; (2) breached that duty by leading public school students in affirming that God exists; and (3) created a social environment that perpetuates prejudice against atheists. Defendants argue that government action that makes no classification is not amenable to an equal-protection challenge. They further argue that because religion is not a suspect classification, their actions are subject to rational-basis review, a standard the New Hampshire Pledge statute easily meets. Plaintiffs disagree.

"The Equal Protection Clause of the Fourteenth Amendment guarantees that those who are similarly situated will be treated alike." In re Subpoena to Witzel, 531 F.3d 113, 116 (1st Cir.

---

[6] The phrase "due process" appears in the last sentence of Count IV, but plaintiffs do not otherwise develop a due-process claim. Defendants do not address due process in their motion to dismiss, nor do plaintiffs mention due process in their objection. As explained below, to the extent that plaintiffs have made a due-process claim at all, it is discussed along with Count V, in tandem with plaintiffs' "right-of-parenthood" claim. See Parker, 514 F.3d at 102 (discussing "[t]he due process right of parental autonomy").

2008) (citing City of <u>City of Cleburne v. Cleburne Living Ctr.,</u>
<u>Inc.</u>, 473 U.S. 432, 439 (1985)).

   With regard to legislative enactments like the New Hampshire
Pledge statute, "the classic violation of equal protection [is] a
law [that] creates different rules for distinct groups of
individuals based on a suspect classification." <u>Wirzburger v.</u>
<u>Galvin</u>, 412 F.3d 271, 283 (1st Cir. 2005) (citing <u>Strauder v.</u>
<u>West Virginia</u>, 100 U.S. 303 (1879)).  The New Hampshire Pledge
statute "do[es] not require different treatment of any class of
people because of their religious beliefs," <u>Wirzburger</u>, 412 F.3d
at 283, nor does it "give preferential treatment to any
particular religion," <u>id.</u>  Rather, it applies equally to those
who believe in God, those who do not, and those who do not have a
belief either way, giving adherents of all persuasions the right
to participate or not participate in reciting the pledge, for any
or no reason.[7]  Moreover, to the extent the New Hampshire Pledge
statute may be construed as compelling agnostics and atheists to
listen to their classmates recite the Pledge, the court has ruled
that the Pledge is not a prayer or religious exercise, and, even

_____

   [7] The <u>Wirzburger</u> court also noted that the Supreme Court has
"sometimes struck down facially neutral laws, which it recognized
were crafted to avoid facial discrimination."  412 F.3d at 283
(citing <u>Hunter v. Erickson</u>, 393 U.S. 385, 387-91 (1969);
<u>Washington v. Seattle Sch. Dist. No. 1</u>, 458 U.S. 457 (1982).  The
New Hampshire Pledge statute gives no indication in its terms or
legislative history that it was enacted with a hidden purpose to
discriminate against atheists or agnostics.

if it were, plaintiffs' constitutional rights are not violated by recitation of the Pledge in the presence of the Doe children.

Given plaintiffs' claim that defendants violated the Doe children's equal-protection rights by leading public-school students in reciting the Pledge, Count IV may, perhaps, be better understood as a claim of discriminatory treatment, as opposed to a facial challenge to the Pledge statute.  Such a claim, however, is unavailing.  "A requirement for stating a valid disparate treatment claim under the Fourteenth Amendment is that the plaintiff make a plausible showing that he or she was treated differently from others similarly situated."  Estate of Bennett v. Wainwright, 548 F.3d 155, 166 (1st Cir. 2008) (citing Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008); Witzel, 531 F.3d at 118)).  Moreover:

> To succeed on a claim of discriminatory treatment, a plaintiff must show that the defendant acted with discriminatory intent or purpose.  Washington v. Davis, 426 U.S. 229, 239-40 (1976).  That is, the plaintiff must establish that the defendant intentionally treated the plaintiff differently from others who were similarly situated.  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  A discriminatory intent or purpose means that the defendants "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group."  Wayte v. United States, 470 U.S. 598, 610 (1985) (internal quotation marks omitted).

<u>Witzel</u>, 531 F.3d at 118-19 (parallel citations omitted).  Here,
plaintiffs have not alleged that the Doe children's teachers
acted with a discriminatory intent.

Because the New Hampshire Pledge statute does not create
rules for agnostics and atheists different from rules applicable
to monotheists or polytheists, and because there are no
allegations that the Doe children's teachers acted with a
discriminatory intent, defendants are entitled to dismissal of
the equal-protection claim stated in Count IV.

<u>Count V</u>

In Count V plaintiffs, claim that defendants violated the
Doe parents' federal constitutional rights of parenthood (and
their children's concomitant rights) by leading the children's
classes in reciting the Pledge of Allegiance.  Defendants counter
that plaintiffs' parental-rights claim is foreclosed by the court
of appeals' decision in <u>Parker v. Hurley</u>.

Plaintiffs base Count V on a "federal constitutional right
of parenthood, which includes the right to instill the religious
beliefs chosen by the parents, free of governmental
interference."  (First Am. Compl. ¶ 68.)  But, they do not
identify any specific constitutional provision guaranteeing such
a right.  <u>Wisconsin v. Yoder</u>, 406 U.S. 205 (1972), upon which

plaintiffs rest Count V, is a free-exercise case.  See Yoder, 406 U.S. at 213.  In Parker, the court of appeals for this circuit explained its view that in Yoder, "the Court did not analyze separately the due process and free exercise interests of the parent-plaintiffs, but rather considered the two claims interdependently, given that those two sets of interests inform one [an]other."  Parker, 514 F.3d at 98 (citing Yoder, 406 U.S. at 213-14).  The court then followed the model it identified in Yoder, and analyzed jointly the "plaintiffs' complementary due process and free exercise claims."  Parker, 514 F.3d at 101.

Following the analytical model established in Yoder and Parker, dismissal of plaintiffs' free-exercise claim compels dismissal of their due-process/parental-rights claim.  The court can discern nothing of the latter that remains after dismissal of the former.

Count IX

In Count IX, plaintiffs ask the court to rule, without any colorable basis in law, that "the use of a Pledge of Allegiance containing the words 'under God' is void as against public policy" (First Am. Compl. ¶ 84), because if fosters divisiveness.  Count IX is summarily dismissed for failure to state a claim on which relief can be granted.

Counts VI–VIII

Counts VI through VIII state claims under Part I, Article 6 of the New Hampshire Constitution (Count VI), RSA 169–D:23 (Count VII), and the common law of New Hampshire, as expressed in Sanborn v. Sanborn, 123 N.H. 740 (1983) (Count VIII).  Because all of plaintiffs' federal claims have been dismissed, it is appropriate to reassess the court's exercise of jurisdiction over plaintiffs' remaining state claims.  Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (citing Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256–57 (1st Cir. 1996)).  Factors to consider include "fairness, judicial economy, convenience, and comity," Camelio, 137 F.3d at 672 (citation omitted), with a particular emphasis on comity, see id. (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).  Here, principles of comity counsel in favor of not exercising supplemental jurisdiction over plaintiffs' state-law claims.  Accordingly, Counts VI through VIII are dismissed, without prejudice to refiling in a state court of competent jurisdiction.

## Conclusion

For the reasons given, all three pending motions to dismiss (documents 46, 55, and 56) are granted.  The Clerk of the Court shall enter judgment in accordance with this order and close the case.

35

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 30, 2009

cc:  Michael A. Newdow, Esq.
     Rosanna T. Fox, Esq.
     David H. Bradley, Esq.
     Eric B. Beckenhauer, Esq.
     Gretchen Leah Witt, Esq.
     Theodore C. Hirt, Esq.
     Nancy J. Smith, Esq.
     Eric C. Rassbach, Esq.
     Kevin J. Hasson, Esq.
     Bradford T. Atwood, Esq.
     John A. Simmons, Sr., Esq.
     Benjamin W. Bull, Esq.
     David A. Cortman, Esq.
     Jeremy D. Tedesco, Esq.
     Michael J. Compitello, Esq.